Scott *v.* Smart's Executors.

### Scott *v.* Smart's Executors.

On the change from a territorial to a state government, the legislature of the state
abolished the supreme court of the territory, and transferred certain causes
pending therein to the supreme court and court of chancery of the state; but
certain other causes pending therein, owing to a defect in the law, were not
transferred to any court. The following year, the legislature passed an act
transferring these last mentioned causes to the supreme court of the state.
*Held,* That it was competent for the legislature to pass the act last mentioned,
and that by virtue thereof, the causes were transferred to the supreme court of
the state, to be proceeded in and disposed of.

To hold a law unconstitutional, it must be a plain violation of some provision
contained in the constitution. It must be an ex post facto law, or a law im-
pairing the obligation of contracts, or a law manifestly in collision with some
constitutional provision.

PETITION to revive a suit in chancery. The facts fully appear in
the opinion of the court.

*Backus,* for complainant.

*Fraser and Davidson,* for defendants.

*By the court,* WING, J. The petition in this case is filed, praying
that a suit pending in this court may be revived.

The petition was filed January 2, 1849. It states that the petitioner
heretofore exhibited his bill in the supreme court of the territory of
Michigan, against defendants, which by an act of the legislature has
been transferred into this court.

To this petition, some of the defendants therein named filed their plea, on the 4th of January, 1849, in which they state that said suit was originally commenced in the supreme court of the late territory of Michigan on the 31st day of August, 1826, in which court it continued and was pending and undetermined at the time of the adoption of the constitution of the state of Michigan: that by virtue of an act of the legislature of the state, entitled "An act to establish a court of chancery, and for other purposes," adopted the 26th of March, 1836, and which took effect on the 4th of July, 1836, it was enacted and declared, that all the powers and jurisdiction conferred on the supreme court of the late territory of Michigan, in and by an act entitled "An act to prescribe the mode of proceeding in chancery," are hereby conferred on said court of chancery: that by virtue of the provisions of this act, and a certain other act of said legislature, entitled "An act to organize the supreme court of the state of Michigan, and to establish circuit courts," approved the 26th March, 1836, which also took effect on the 4th of July, 1836, all jurisdiction, powers, and authority vested in said supreme court of the late territory of Michigan, touching all suits in chancery or otherwise, were repealed, abrogated, and taken away, and said court was then and there abolished, and ceased to exist, on said 4th of July, 1836; and that by force and effect of the provisions of the Revised Statutes of 1838, page 690 to 697, all and every law and provision of law by which said late supreme court had been either created or vested with equity powers or jurisdiction, were repealed: that on the 26th March, as well as on the 4th of July, 1836, the said suit in chancery was and remained undetermined in said supreme court of the territory of Michigan: that Elon Farnsworth had been solicitor, and so continued, and after the death of Miller he became one of the defendants, as executor of Miller, and on the 18th of July the said Farnsworth became and continued to be the chancellor, until the 28th day of February, 1842: that said suit so remaining in said supreme court of the late territory of Michigan has not been legally removed or transferred to this or any other court having cognizance to hear, try, and determine the same, by reason of which the said suit has become discontinued, abated, and ceased to be pending in any court whatever. The defendants, therefore, humbly pray the judgment of this court, whether the complainant is entitled to have said suit revived

against them, and pray to be hence dismissed, with their reasonable costs, &c.

No objection seems to be made to the form or manner of raising the question arising upon the plea; the authorities appear to warrant such a plea to a petition for revivor.

The first section of the schedule accompanying the constitution, provides, that no inconvenience may arise from a change of the territorial government to a permanent state goverment, it is declared, that all writs, actions, prosecutions, contracts, claims and rights of individuals and bodies corporate, shall continue as if no change had taken place in this government, &c.; and all process which may, before the organization of the judicial department under this constitution, be issued under the authority of the territory of Michigan, shall be as valid as if issued in the name of the state.

Section 2. All laws now in force in the territory of Michigan, which are not repugnant to this constitution, shall remain in full force until they expire by their own limitation, or be altered or repealed by the legislature.

In this section of the schedule we have a plain expression of the intention of the framers of the constitution, that all causes pending in the courts of the territory of Michigan should be preserved. It was left to the legislature to provide courts for the reception and determination of such causes.

The word "actions" in the schedule, is, I think, used in its largest sense, and not in a limited or technical sense, and includes all civil actions pending in court at the time, whether they were cases at law or in equity. It is used in contradistinction to "prosecutions."

The constitution took effect and became operative from and after the first Monday of November, 1835. It may have been supposed that there was a doubt whether or not, by the mere change of sovereignty in the territory, all courts and legal proceedings would not terminate, and therefore the first section of the schedule was adopted. And it may have been expected that all causes then pending in the territorial courts would be transferred to the state courts, either before or at the time the territorial courts should be abolished.

By the act of the state legislature organizing the supreme court of the state, passed the twenty-sixth day of March, 1836, and which took ef-

fect on the fourth of July thereafter, all civil suits at law, and prosecu-
tions pending in the supreme court of the territory of Michigan, were
transferred to the supreme court of the state; and by an act establish-
ing the state court of chancery, which was enacted and took effect the
same day with the law last cited, all suits and matters in chancery re-
maining and pending in the supreme or circuit courts of the late
territory of Michigan were transferred to the court of chancery
established by that act, *except* those cases in which the chancellor was a
party or of counsel; and it was enacted that this class of causes should
be proceeded in by the courts in which the same originated, as though
this act had not passed: provided, that in cases in which the chancellor
might be interested or of counsel, the supreme court should have origi-
nal jurisdiction.

It is, perhaps, enough to say, in relation to these acts, that the su-
preme court of the state held that they did not transfer the class of
causes in which the chancellor had been counsel or a party, to the new
supreme court. The opinion of the supreme court was not reduced
to writing, and, therefore, we can only state the fact handed down to us
by tradition.

The next question is, whether there is any limitation to the provision
in the schedule preserving and continuing causes. It is said, the first
section may be held to refer to the second section, as a means by which
the causes were to be saved; and that if the laws were repealed which
had been enacted by the territorial legislature, there could be no court
in which causes could be left pending and to be continued: that there
could be no suit without a court in which suitors could have a standing
or their causes remain.

But it is urged, in opposition to this view, in substance, that the
schedule preserved the causes until some new position should be assigned
to them by a law of the state, whether sooner or later; and that the
effect of abolishing the supreme court of the territory could not be to
destroy that which was preserved and protected by a higher law, the
constitution, to the provisions of which all the people of the state (in-
cluding defendants) are presumed to have assented.

I must confess, these various considerations have occasioned me some
embarrassment in working out a result which shall fully accord with the
clearly expressed intention of the framers of the constitution: for if

these causes are saved without the aid of legislation, or in spite of it, it must be accomplished by the mere power of the schedule. How it was done, I cannot clearly perceive—where the causes were preserved, I cannot clearly understand, any more than it could be seen or understood how or where Mohomet's coffin was suspended betwixt the heavens and the earth: and yet it is a matter of history, and as certain as a large portion of the facts stated by historians, that the coffin was so suspended. In the minds of the faithful, there was no difficulty in the case—no lack of power to accomplish such a result, and no lack of faith to believe in its accomplishment.

Without undertaking to express a very decided opinion as to the position of this cause after the law of this state took effect, abolishing the old territorial supreme court, let us proceed to trace the history of the legislation in reference to it.

The supreme court having decided that this cause was not transferred from the supreme court of the territory to that of the state, and the old supreme court having been abolished, the legislature, at their next session, on the 15th of February, 1837, passed another law, which was intended to remedy the defects in the prior legislation in relation to this class of cases. By this law it was provided, that all suits and matters in chancery in which the chancellor of the state had been a party or was concerned as counsel, theretofore commenced or pending in the supreme court of the territory of Michigan, and still undetermined, should be and the same were thereby transferred to the supreme court of the state for the first circuit; and all such chancery causes commenced or pending in said late supreme court, and still undetermined, in which the chancellor might not have been a party or concerned as counsel, should be and the same were transferred to the court of chancery for the first circuit; and it was further enacted, that said courts respectively should have cognizance thereof, and should proceed to hear, try and determine the same as if originally commenced in said court. Sess. L. 1837, p. 11.

By the Revised Statutes of 1838, p. 692, the act creating the old supreme court, and also the act creating the court of chancery above referred to, were repealed. P. 696.

On the 24th day of January, 1843, another law was passed, by which it was declared, that chancery causes depending in the supreme

court of the state, *originally commenced there*, are transferred ·to the court of chancery; but causes in which the chancellor may be interested as counsel, may be decided by a judge. Sess. L. 1843, p. 8.

At a session of the supreme court held in January, 1839, the complainant again presented himself in the supreme court with the files in this cause, and the court ordered this cause docketed. He then filed a petition to revive the cause against the representatives of parties deceased. Defendants again met him there and opposed his motion—or, rather, they moved after the case was docketed that it be dismissed. The chancellor filed his certificate that he had been counsel in this cause.

We cannot learn what disposition the court made of the motion to dismiss, nor, indeed, that they acted upon it at all. After the act of 1843 was passed, it is said the supreme court intimated an opinion that this cause was, by operation of that law, tranferred to the court of chancery, and the chancellor thereafter entertained jurisdiction of it. But in 1848, the judge sitting in chancery in the first circuit dismissed the cause, and ordered it to be stricken from the docket, as never having been properly there, because it was not a cause which had, in the terms of the act of 1843, been originally commenced in the supreme court of the state. Thereupon the complainant, after attending the court of chancery a number of years, was remitted again to such rights as he had under the schedule, the laws, and the order of this court in the cause, by which it was docketed in 1839. So many years having elapsed since complainant filed his first petition in this court, he has, during the present term, filed a new petition to revive, to which defendants have plead as before stated.

The act of 1837, clearly embraces this cause. But it is said, it comes too late, as the cause had ceased to exist in any court, and by this act the suit or files were not transferred to this court. And the defendants claim that, inasmuch as the cause was discontinued, they have acquired a vested right, a right to remain out of court until brought in by the commencement of a new suit, in the ordinary way provided by the general laws of the land; and that the legislature cannot, by such a law, interfere or control their rights.

Before proceeding to the consideration of the operation of the act of 1837, we will remark, that if it was competent for the legislature to enact such a law, the repeal of the act of 1836, creating the supreme

court under the constitution, by the repealing act of 1838, did not affect the act of 1837. Complainant's rights were saved by the fifth section of the general repealing act. R. S. 1838, p. 689. The act of 1837 was not repealed.

It is no doubt true, that at common law the process or proceeding in a cause should be regularly continued from term to term, or from one day to another in the same term, between the commencement and final judgment, and if there be any lapse of a term or want of continuance, the party is out of court, and the plaintiff must begin de novo. 1 Tidd's Pr. 678; 1 Strange 492; 1 Wilson 40; 7 Bac. Abr. 680; 2 Peters 523; 1 Hill 332; 6 Com. Dig. 266-7-8-9.

It was to meet the force of this rule that the provision of the schedule was adopted. If it had not the effect claimed for it, if by it the suit was not saved in spite of the common law rule, then is it in the supreme court by virtue of the statutes quoted? It is not objected that the transfer is made by statute, but it is insisted that no statute can have the effect to revive a suit, and give it life and a position on the calendar of this court, which died out of court for want of a court to entertain it. And if by operation of law the suit ceased, then a right accrued to the defendants to be discharged from it; and this became a vested right, and the legislature cannot entrench upon it.

The constitution of this state, article 1, sec. 17, provides that "no bill of attainder, ex post facto law, or law impairing the obligation of contracts, shall be passed." These are the only provisions of the constitution which have fallen under my eye, which I can suppose can have any reference to the question we are discussing.

The acts of the English parliament are in that country omnipotent, and they override private rights, if the intention of the parliament to do so is plainly expressed.

In these United States, it is said that in a private case between individuals, the court will struggle hard against a construction which, by a retroactive operation, will affect the rights of parties; and statutes are generally to be construed to operate in futuro, unless a retrospective effect be clearly intended. 2 Gall. R. 271; 9 Bac. Abr. Stat. C. p. 221 and note. Statutes are never to be applied retrospectively by mere construction. Jarvis *v.* Jarvis, 3 Edw. R. 462: 10 Mass. 437; Somerset *v.* Dighton, 12 *id.* 383; 16 *id.* 215; Thames Manufacturing Co.

v. Lathrop, 7 Conn. 550. The court say, when a statute is retrospective to a certain extent and for a certain purpose, it will not receive a retroactive operation to any greater extent, or for any other purpose.

It is a well settled doctrine, that the provision in our constitution, which is the same as that in the constitution of the United States in respect to ex post facto laws, does not refer to any but criminal cases or offences. 3 Story's Com. on Const. 266, sec. 1392. Judge Story remarks, in the same section, the other provision in the constitution relates to the impairing the obligation of contracts; and he then states, there are many laws of a retrospective character which may yet be constitutionally passed by the state legislatures, however unjust, oppressive or impolitic they may be. Retrospective laws are indeed generally unjust, and, as has been forcibly said, neither accord with sound legislation nor the fundamental principles of the social compact. Still they are, with the exceptions above stated, left open to the states according to their own constitution and government, and become obligatory if not prohibited by the latter. He cites Beach v. Woodhull, 1 Pet. C. C. R. 2; Calder v. Bull, 3 Dall. R. 386.; Satterlee v. Matthewson, 2 Peters 380; Wilkinson v. Leland, id. 627, 661.

Many other cases are cited, and many other illustrations are given by this commentator, showing clearly that such a law as this does not impair the obligation of a contract. In some of the cases cited, in which it was held that the statutes under consideration did not impair the obligation of contracts, they operated upon the rights of parties much more injuriously than this law does upon the rights of the defendants. Some of the cases, it is true, would fall within the prohibition in our constitution, restraining the legislature from exercising judicial powers, as, for instance, the case of Calder v. Bull, in which the legislature of Connecticut granted a new trial, by law passed for that purpose.

In the case cited from 2 Gall. R. 271, a question arose whether a state could pass a law making a plaintiff liable for improvements made on lands by the defendant, who was in possession without right, and against whom judgment passed. The improvements were made before the act was passed. It was held, it did not impair the obligation of contracts, but as the law was retrospective, which was prohibited by the constitution of New Hampshire, the court held it to be void, and for this reason only.

In a case in 4 Wendell 206, an appeal was taken under an existing law, but the bond did not conform to the law; but before the appeal was dismissed, a law was passed authorizing an amendment of the bond. The law was held to be constitutional, though by the law before the new statute, the appellee was entitled to have the cause dismissed. This was a vested right, in the same sense in which defendants' right was vested.

In a note to the case in the 16 Mass. 215, the editor says, the act only gives a remedy where none existed before, and in this respect it did not differ from many acts giving jurisdiction in equity and providing remedies at law, which have never been thought to be objectionable by reason of their retroactive effect.

The cases cited from 3 Paige 344; 6 id. 323; 7 id. 354, are cases of vested rights not connected with the mere question of remedy. In the case in 2 Peters 380, cited above, the court held, that an act confirming a sale, before void, was valid if it did not affect the settled rights of property. In the case of Butler v. Palmer, 1 Hill 324, the question was made whether, after a sale of property subject to a redemption for a given period, the legislature could, by law subsequently passed, shorten the period of redemption. It was held they could do so, though, if no time of redemption was left, the law would be void. The court likened the power exercised by the legislature to the power exercised in passing statutes of limitations. Judge Cowen says: I know that rights of action and other executory rights are said to be vested. They are so, and a subsequent statute ought not to repeal them, though it may do so by express words, unless they amount to a contract within the meaning of the constitution. He further says, in the same case: The authorities are abundant in the United States courts, and in our own state, asserting that a statute impairing the remedy is constitutional. He cites 5 John. R. 139, 142. Strong expressions are to be found in the books against legislative interference with vested rights, but it is not conceivable, that after allowing the few restrictions to be found in the federal and state constitutions, any further bounds can be set to legislative power by written prescription. Judge Cowen mentions many cases of what he calls inchoate rights, and many cases showing that the legislature may pass acts affecting the remedy where it does not affect the contract, and where no legal proceed-

ing is concluded by judgment under an existing law. See Cochran *v.* Van Surlay, 20 Wendell 365.

At the argument of this cause, reference was made to laws passed by congress. These acts can hardly be considered as strictly authorities upon this subject, and yet they afford examples and instances of the interpretation given to the constitutional inhibition, showing what was thought of this restriction by the great men who assisted in passing acts of congress immediately after the powers of congress under the constitution had been most thoroughly canvassed by the authors of the Federalist, and other works upon the constitution, and at a time when no latitude of construction had been indulged, and when the states were jealously watching and guarding against encroachments by congress.

By the act of 22d May, 1798 (vol. 3 U. S. Laws, p. 8), after reciting in the preamble that a quorum of judges did not attend to hold the circuit court for the district of South Carolina, for the purpose of doing business at the June term in 1797, in consequence of which certain provisions are now necessary to prevent a failure of justice in said court, it was enacted, that the district judge might direct the clerk to summon a jury to attend the November term of that court, that he might summon the same jury that attended the June term. By the second section it was provided, that all suits and proceedings, of what nature and kind soever, which had been commenced in the said court, and not finished, should be proceeded in at the ensuing term, in the same manner and to the same effect as if the said circuit court had been regularly held for the purpose of business in June term, 1797, and continuances had been regularly entered of all suits and proceedings in the said term, in which they were depending in the usual manner of proceeding, as the case might be.

A similar act was passed by congress, transferring causes to the Indiana courts, after the north-west territory was divided. See vol. 3 U. S. Laws, 424; and see acts of congress, April 12, 1812, in relation to cases and courts in Louisiana, 4 vol. U. S. Laws 402. On the 28th January, 1795, congress passed an act by which suits and process pending in the district court of Pennsylvania, in November, 1794, and discontinued by a failure to hold that court at any time since the last day of July, 1794, were revived, and day was given to all suits and process in the

Scott *v.* Smart's Executors.

courts next by law to be holden in the same district, as might have been had at the courts respectively in which they were pending, or to which the same were returnable.

These several acts revive causes which had become discontinued by the operation of the common law rule, and which had not been saved or perpetuated by any law or constitution. I have not been able to ascertain that it was ever supposed these laws violated a vested right, or, if so, that they interfered with that portion of the constitution which guarded contracts, or separated the judicial from the legislative power.

It is true, that laws must, in general, be rules prescribed for civil conduct to the whole community, and not a sudden, transient order from a superior to or concerning a particular person. 1 Black. Com. 44. An act which operates upon the rights or property of only a few individuals, without their consent, is a violation of the equality of privileges guarantied to every subject; it is also an interference with existing interests, and prescribes a new rule for the regulation of them after they have become vested. But this must be understood in reference to vested rights which have some bearing upon the interest secured to a party, as in the case of Mundy *v* Monroe,* decided in this court at the last term, where a statute prohibited an action of ejectment, by which, by the law in force at the time of the contract, the plaintiff had the right to obtain possession and control the rents and profits, this right being a part of his contract, and forming a portion of the security embraced by it.

The inhibition in the constitution was designed to embrace proceedings attempting the interpolation of some new term or condition, foreign to the original agreement, and, therefore, inconsistent with and in violation thereof. The object and aim of the law, is, not to interfere with the obligation of a contract: certainly, no contract can be pretended to exist in this case between the complainant or the sovereign power in the state and the defendants, in reference to any right the defendants may have acquired by going out of court, if they did so. As well might it be said, and with much more plausibility, that the state had assumed to protect the rights of complainant, and keep his cause in court, and that he had a vested right. But the remedy afforded in this case by the statutes, is not affected by the constitution. Suppose a case under the

* Ante, p. 68.

old system of laws, in which a party was confined in jail upon a judgment upon contract, and the legislature had passed a law subsequent to the imprisonment discharging the party from imprisonment, it would not have been an unconstitutional exercise of power, for it would leave the obligation of the contract undisturbed. The states possess the rightful authority to abolish imprisonment for debt, and may apply it to present as well as future imprisonment. Mason v. Hale, 12 Wheaton 370; 6 Howard 630.

By these laws, all the rights which, in a constitutional sense, can be said to be vested in defendants, are preserved to them. They had no judgment: they had not, by the judgment of any court, established any right. The legislature have not presumed to decide upon their constitutional rights: they have only placed the respective parties where their rights may be tried, and where all the obligations growing out of their contracts may be ascertained and protected by the judgment of the court. They have only provided for a trial by this court, in the ordinary and constitutional mode.

It is certainly true, that this species of legislation for particular cases, to bring causes into court which may have been, by operation of a rule of law, discontinued, by granting extraordinary privileges to one party or the other, out of the ordinary course of justice, is susceptible of abuse, and may lead to great injustice, and ought to be warily employed by a wise legislature; but for us to hold a law unconstitutional, it must be a plain violation of some provision contained in the constitution. It must be an ex post facto law, or a law impairing the obligation of contracts, or manifestly in collision with some constitutional provision.

It would be difficult for us to say that a law is unconstitutional which grants a remedy in a class of causes simply affecting the mode in which the party is to be brought into court, leaving him all his other rights, and without which a complainant's rights may be lost, notwithstanding the care and solicitude of the framers of the constitution to preserve them. If the complainant cannot be permitted to proceed with his cause at this late day, without doubt he would be barred from commencing a new suit, which might not have been the case had this court decided against the admission of his suit in 1839.

It is said there are high authorities for saying there is in every gov-

ernment, somewhere, an absolute and despotic power.   3 Dall. R. 386.   The exceptions to this are only such as are expressly specified in the written constitution.   Subject to the provisions of the constitution, the power of the legislature to enact binding laws seems not to be limited.   The exercise of powers such as are brought into operation by these laws, has been looked upon with jealousy by some, whilst others have considered them as necessary, under our form of government, to prevent a total failure of justice in certain cases not falling within the control of the judicial branch.   At any rate, I can discover no clause in the constitution which prohibits them.

We are, therefore, of the opinion that it was competent for the legislature to pass the law in question: that it did not affect any vested right of the defendants, within the meaning of the constitutional prohibition.

But it is said, the files were not removed by the law.   It is usual to provide more in detail for the transfer of causes, and to embrace the files; but we are inclined to think, this objection is not well taken. There can be no cause independent of the files and records, or minutes. The minutes of this cause on the calendar, in the supreme court of the territory, were entered on the calendar of this court in 1839, and the files were then brought into this court, and we think this is sufficient. The laws of the United States, referred to above, contained no provision for removing the files: they remained in the same court, and so did the files in this case.

It is the opinion of this court, that the plea of defendants, filed in this cause, in this court, be overruled.

*Plea overruled.*