FRED A. MAYNARD v. THE BOARD OF CANVASSERS
OF THE FIRST REPRESENTATIVE DISTRICT OF
KENT COUNTY AND CORNELIUS L.
HARVEY, CLERK.

*Constitutional law—Cumulative voting act of 1889.*

Act No. 254, Laws of 1889, which provides for *cumulative* voting in districts entitled to more than one Representative in the State Legislature, is unconstitutional.

*Mandamus.* Submitted December 2, 1890. Denied December 24, 1890.

Relator applied for *mandamus* to compel respondents to declare and certify his election as Representative to

the State Legislature.    The facts are stated in the opinion.

*T. J. O'Brien (C. A. Kent,* of counsel), for relator.

*Uhl & Crane (F. A. Baker,* of counsel), for respondents.

CHAMPLIN, C. J.    The Legislature, at its biennial session of 1889, passed an act numbered 254 (3 How. Stat. p. 2835), entitled—

"An act relating to the election of Representatives to the State Legislature in districts where more than one is to be elected."

Sections 1 and 2 of said act read as follows:

"SEC. 1. *The People of the State of Michigan enact,* That, in all elections of Representatives to the State Legislature in districts where more than one is to be elected, each qualified elector may cast as many votes for one candidate as there are Representatives to be elected, or may distribute the same among the candidates as he may see fit, and the candidates highest in votes shall be declared elected.

"SEC. 2. The name or names of the person or persons for whom such elector intends to vote for as a Representative to the State Legislature shall be written or printed, or partly written and partly printed, upon the ballot containing the names of the persons to be voted for for other State offices, and opposite the name of each person voted for as a Representative to the State Legislature there shall be written or printed in plain figures the number of times the elector intends to vote for said person in whole numbers: *Provided,* That in case the total of the numbers opposite the names of the persons voted for exceed the total number of Representatives to be elected from that district, the excess shall be taken from the person so voted for lowest on the ticket, and, should there still be an excess, then from the next above, until the numbers correspond."

Section 3 repeals all laws and parts of laws inconsistent

therewith. This act was approved by the Governor on July 3, 1889.

The city of Grand Rapids comprises one election district, and is entitled to elect two Representatives to the State Legislature. It is known as "The First Representative District." Fred A. Maynard, the relator, is an elector residing in that district, and in his petition, duly verified, in which he prays for a *mandamus*, states that on November 4, 1890, there were in said election district 14,272 qualified electors duly registered according to law, and entitled to vote for the officers then to be elected, and to elect two Representatives in the State Legislature; and that under the laws of this State each of said electors was entitled to cast his vote for two Representatives in the State Legislature, one vote for each, or to cast for one person for Representative in said Legislature two votes, as the elector might see fit; that at said election 13,000 of said qualified electors voted for the several officers to be elected; that at said election 5 persons were voted for as Representatives, including relator; that the returns from the several voting precincts have been duly returned and filed; that such returns show that, for the office of Representative, relator received 8,368 votes; Mr. White, 7,358; Mr. Hayward, 7,074; Mr. Thaw, 623 votes; and Mr. Belden, 1 vote; that the inspectors in several of the precincts counted and returned the cumulative votes for relator as single votes only; that the board of district canvassers met, and from the returns made a statement that, for said office of Representative, White received 7,258 votes; Hayward, 7,074 votes; Maynard, the relator, 5,374 votes; Thaw, 623 votes; and Belden, 1 vote,—and determined that White and Hayward were elected; that relator had the greatest number of votes, and was duly elected Representative; that he bases

his claim to election upon the legality of said cumulative votes, and avers that if every ballot having his name only for Representative as aforesaid, with the statement "two votes" opposite the name as aforesaid, shall be counted as two votes, then he received more than 10,000 votes for said office, and this exceeded the votes given for any other candidate. He admits that, if said votes cannot be counted for him cumulatively,—that is, if every ballot having the statement "two votes," as aforesaid, for him is legal only as one vote, and must be so counted,—then the said White and Hayward received a greater number of votes for Representative at said election than the relator. He prays for a *mandamus* to compel the board of district canvassers to declare him elected, and that the chairman and clerk certify the same.

The board of canvassers have answered, in which they deny that the cumulative votes cast for relator are legal, and deny that they should be counted. They set up that, previous to the election held on November 4 last, a convention of the Democratic party of the first representative district met, and placed in nomination Arthur S. White and John W. Hayward for the office of Representatives in the State Legislature, to be voted for upon a general ticket at the said election, and their names were so printed upon the tickets of that party; that a convention of the Republican party also met previous to the election, and placed in nomination only one person as Representative, and that person was Fred A. Maynard, the relator, and his name was printed upon the tickets of that party, with the words "two votes" opposite said name; that the ballots used at said election were furnished by the Secretary of State of the State of Michigan for that purpose; that the returns from every precinct show a large excess of votes cast over the number of voters listed in the poll-lists. These poll-lists show that 13,164 electors voted in the

city, and the return of votes shows that 23,799 votes were cast,—an excess of 10,635 votes. The board claim that the act above recited is unconstitutional and void, and, so considering it, they disregarded it, and declared those persons elected who had received the highest number of votes, counting one vote to a ballot.

At the time of the argument, petitions for *mandamus* had been filed on behalf of four persons who claim to have been elected by cumulative votes to the office of Representative in the city of Detroit, and counsel representing the parties in interest there were permitted to present their views upon the constitutionality of the law.

There has been in the latter half of the present century a growing desire to secure to minorities a proportionate representation in legislative and corporate bodies, and from time to time schemes have been advocated by those who have desired to bring about what they claim as a reform in existing modes of election to secure to the minority a just and proportionate representation. These schemes may all be reduced to four well-recognized classes, viz.:

1. The "restrictive," which requires a certain number to be elected on one ticket, and prohibits any elector from voting for the whole number to be elected. Thus, if four are to be elected, no one can vote for more than two.

2. The "cumulative," which requires three or more to be elected, and permits the elector to cast as many votes as there are persons to be elected, and to distribute such votes among the candidates as the elector may choose.

3. The "Geneva," "free vote," or "Gilpin" plan. By this plan the districts are required to be large, and each party puts in nomination a full ticket, and each voter casts a single ballot. The whole number of ballots having been ascertained, that sum is divided by the number of places to be filled, and each ticket is entitled to the places in proportion to the number of votes cast by it, taking the persons elected from the head of the tickets.

This plan doubtless comes the nearest to a proportional representation of the minority of any plan devised which is practical for popular elections. It was originated by Mr. Gilpin in 1844, who advocated it in a pamphlet published in Philadelphia. It has never been adopted in this country, but has become the *liste libre* of Geneva, and is said to work well in Switzerland.

4. The "Hare" plan, or "single vote." This method is too intricate and tedious ever to be adopted for popular elections by the people. It requires successive counts and redistribution of the votes until an election is reached.

The effort to realize minority representation by the use of the restrictive method was tried in Ohio, under an act passed in that state. The law was declared unconstitutional by the supreme court. *State v. Constantine*, 42 Ohio St. 437. That court held that it was the right of every elector to vote for every candidate or person to fill the offices provided by law to be elected by vote of electors, and a law which said that no person could vote for more than two of the four persons to be elected took away from the elector a substantial right guaranteed to him by the constitution.

In Pennsylvania, Mr. Buckalewe for many years advocated the adoption of the system of cumulative voting in order to secure minority representation; and, mainly through his efforts, in 1874 a provision was inserted in the constitution of Pennsylvania (article 16, § 4) permitting stockholders in corporations to vote cumulatively upon the shares of stock. It was held in *Hays v. Com.*, 82 Penn. St. 518, that, as to corporations existing at the time the constitutional provision was adopted, the constitutional provision could not apply, because it interfered with and affected existing vested rights.

In 1870 the state of Illinois adopted a new constitution, which contains this provision (article 4 §§ 7, 8):

"The house of representatives shall consist of three

times the number of the members of the senate, and the term of office shall be two years. Three representatives shall be elected in each senatorial district at the general election in the year of our Lord 1872, and every two years thereafter. In all elections of representatives aforesaid, each qualified voter may cast as many votes for one candidate as there are representatives to be elected, or may distribute the same, or equal parts thereof, among the candidates, as he shall see fit, and the candidates highest in votes shall be declared elected."

In Nebraska (article 11, § 5), in West Virginia (article 11, § 4), in Missouri (article 12, § 6), and in California (article 12, § 12), by constitutional enactment, cumulative voting is permitted upon stock in corporations. So far as I am aware, Illinois is the only state which has tried the experiment of cumulative voting for members of the legislature. It is significant that all the states which have authorized such voting have submitted it to the people for their adoption as a part of the fundamental law. In Ohio the legislature endeavored to authorize it, without a constitutional amendment, and it was declared unconstitutional. In New York there has been legislation sanctioning such voting in certain cases; and, although the question has been twice before the court of appeals of that state, that court found a way of disposing of the cases in which the questions were raised without passing upon the constitutionality of the law. *People v. Crissey,* 91 N. Y. 616; *People v. Kenney,* 96 Id. 294.

Such has been the action of other states. Is the law contrary to the Constitution of this State? The provisions of the Constitution bearing upon this question are those relating to elections, and those to the election of Representatives. Article 7, § 1, prescribes the qualification of electors. It says: "In all elections, every male citizen * * * shall be an elector, and entitled to vote." Section 2 provides that "all votes shall be given by ballot, except for such township officers as may be author-

ized by law to be otherwise chosen." Article 4, § 2, provides that the Senate shall consist of 32 members. They shall be elected for two years, and by single districts. Each district shall choose one senator. No county shall be divided in the formation of Senate districts, except such county shall be equitably entitled to two or more Senators. Section 3 provides that the House of Representatives shall consist of not less than 64, nor more than 100, members. Representatives shall be chosen for two years, and by single districts. No township or city shall be divided in the formation of a Representative district, but, when any township or city shall contain a population which entitles it to more than one Representative, "then such township or city shall elect, by general ticket, the number of Representatives to which it is entitled." Section 34 provides that the election of Senators and Representatives shall be held on the Tuesday succeeding the first Monday of November biennially. The first Constitution, adopted in 1835, was substantially the same, except that elections were annual. Senators and Representatives were not required to be elected by single districts.

Laws were immediately enacted providing for elections, and the manner of conducting them, under which every elector was entitled to express his will as to the choice of rulers, and who should represent him in the Legislature, by depositing a ballot upon which his choice was indicated, containing the name of one person for one office; and if two ballots were found folded together in the box, or if any ballot included more than one name for any office, they were destroyed as fraudulent and illegal, and not counted. These laws were in force at the time of the adoption of the present Constitution, and have been continued in force ever since. They afford a practical construction of the right of every elector to vote for every

officer to be elected, and that his vote shall be of equal effect with, and no more than, the vote of every other elector for every officer to be elected. Laws were passed, and exist to-day, punishing any elector for voting more than once for any candidate. Repeaters and ballot-box stuffers were condemned under severe penalties. Such has been the Constitution and practical operation under it for more than half a century. More than this, such has been the practice by all the states of our Union under constitutional provisions similar to ours.

It was conceded upon the argument by counsel who appeared to defend the constitutionality of this law that, when the Constitution was adopted, no such thing was thought of as cumulative voting; that it is a recent invention; and that our people, when they adopted the Constitution, had no thought of investing the Legislature with the right of enacting a cumulative voting law; but they contend that, no matter what has been the uniform custom, the Legislature has the power to enact a cumulative voting law, or any other law that is not expressly or by plain implication forbidden them to do by the Constitution. The rules for construing the Constitution of this State have often been passed upon by this Court, and certain principles recognized in the performance of this duty. Thus, it has been said that, before an act of the Legislature can be declared by the courts unconstitutional, it must be prohibited by the express words of that instrument, or by necessary implication; and some members of the Court have gone so far as to say that, before you can declare the act void, you must be able to lay your finger upon the very language of the Constitution which prohibits the exercise of the power of the Legislature to enact the law. *Scott v. Smart's Ex'rs*, 1 Mich. 295; *People v. Gallagher*, 4 Id. 244; *Sears v. Cottrell*, 5 Id. 251; *Tyler v. People*, 8 Id. 320; *People v. Blodgett*, 13 Id.

127; *People v. Mahaney*, Id. 481. The rule above announced has not been unquestioned, and in almost every case the result announced failed to secure the unanimous concurrence of the members of the Court.

In reaching a conclusion as to whether an act of the Legislature is prohibited by the express language or by necessary implication, and to enable the Court correctly to construe the Constitution, certain rules have been laid down for its guidance which will be now referred to.

" Constitutions," says Mr. Justice COOLEY in the case of *Bay City v. State Treasurer*, 23 Mich., at page 506, "do not change with the varying tides of public opinion and desire; the will of the people therein recorded is the same inflexible law until changed by their own deliberate action; and it cannot be permissible to the courts that, in ·order to aid evasions and circumventions, they shall subject these instruments, which in the main only undertake to lay down broad general principles, to a literal and technical construction, as if they were great public enemies, standing in the way of progress, and the duty of every good citizen was to get around their provisions whenever practicable, and give them a damaging thrust whenever convenient. They must construe them as the people did in their adoption, if the means of arriving at that construction are within their power."

Chief Justice CHRISTIANCY, in *Kennedy v. Gies*, 25 Mich. 83, said:

"In legal reasoning, and in the construction of constitutions and statutes, we are often compelled to content ourselves with conclusions somewhat less certain than those involved in mathematical axioms, because neither conventions nor legislatures always use language with mathematical accuracy, and neither the human mind nor human affairs will always submit to merely mathematical. rule. For various reasons, and ·upon various grounds, ·exceptions or qualifications are sometimes implied, though not expressed."

The learned Judge then instances cases where, if the Legislature should give to courts jurisdiction to try

cases involving certain amounts or of a certain character, such act of the Legislature would not give such judge the right to try his own cause. In that case, also, he held that it was legitimate to inquire whether there was not something in the nature of the provision itself, considered in connection with the legislative and judicial history of the State, and the action of the convention which framed it, which might furnish a satisfactory inference that such an exception was intended, and should therefore be implied.

In *People v. Harding*, 53 Mich. 485, Mr. Chief Justice COOLEY said:

In seeking for the real meaning of the Constitution, "we must take into consideration the times and circumstances under which the State Constitution was formed, the general spirit of the times, and the prevailing sentiments among the people. Every constitution has a history of its own, which is likely to be more or less peculiar, and, unless interpreted in the light of this history, is liable to be made to express purposes which were never within the minds of the people in agreeing to it. This the Court must keep in, mind when called upon to interpret it, for their duty is to enforce the law which the people have made, and not some other law which the words of the Constitution may possibly be made to express."

In the case of *Attorney General v. Detroit Common Council*, 58 Mich. 216, some views of our late associate, Mr. Justice CAMPBELL, are of special significance as bearing upon the question under consideration. He said:

"It is needless to explain that under that instrument the whole scheme of government, in every department, depends upon the action of the qualified voters in their election districts.   *   *   *   All legislation imposing restraints or conditions upon voting must conform to the other clauses and provisions of the Constitution. No part of that instrument can be allowed to override or destroy any other part.   *   *   *   There is nothing in the Constitution which permits the Legislature, under

the desire to purify elections, to impose any conditions which will destroy or seriously impede the enjoyment of the elective franchise. And as the right of voting is the same everywhere, it is obvious that the conditions regulating the manner of exercising it must be the same, in substance, everywhere. The machinery of government differs in its details in cities, villages, and townships; and of course it is unavoidable that there must be some differences in methods and officers to administer the election laws. But it cannot be lawful to create substantial or serious differences in the fundamental rights of citizens in different localities in the exercise of their voting franchises."

In the light of these decisions there is in my mind no doubt that the act under consideration is unconstitutional. The Constitution is the outgrowth of a desire of the people for a representative form of government. The foundation of such a system of government is, and always has been, unless the people have otherwise signified by their constitution, that every elector entitled to cast his ballot stands upon a complete political equality with every other elector, and that the majority or plurality of votes cast for any person or measure must prevail. All free representative governments rest on this, and there is no other way in which a free government may be carried on and maintained. That the majority must rule, lies at the root of the system of a republican form of government no less than it does in a democratic. When there are more than two candidates for the same office placed in nomination, it may often happen that one candidate, although he may receive more votes than any other, may not receive a majority of the votes cast· Still the principle of majority rule is preserved, for in such case more of the electors prefer such candidate than they do any other particular candidate to represent them. It is the constitutional right of every elector, in voting for any person to represent him in the Legislature, to

express his will by his ballot; and such vote shall be of as much influence or weight in the result, as to any candidate voted for, as the ballot and vote of any other elector. The Constitution does not contemplate, but by implication forbids, any elector to cast more than one vote for any candidate for any office. This prohibition is implied from the system of representative government provided for in that instrument.

The political history of the State from 1836 to the present time shows that every elector has an equal voice in the choice of those who shall represent the people in the Legislature. It is implied in those provisions of the Constitution which require that Representatives in the Legislature shall be chosen by ballot, and by single districts. By these provisions every elector expresses his wish by ballot, and a single vote is implied. It is implied in those provisions of the Constitution that declare that every male citizen of 21 years of age, and possessing the qualifications prescribed, shall be entitled to vote at all elections; and that all votes shall be given by ballot, except for such township officers as may be authorized by law to be otherwise chosen. What do these provisions express? What is the meaning of the word "vote?" It means, according to Worcester,—

"Suffrage; voice or opinion of a person given in some matter which is commonly to be determined by a majority of voices or opinions of persons who are empowered to give them; the wish of an individual in regard to any question, measure, or choice, expressed by word of mouth, by ballot, or otherwise; that by which the will, preference, or opinion of a person is expressed; a ballot."

See, also, Bouv. Law Dict. tit. "Vote." And what is meant by the word "elections," used in this article of the Constitution? Bouvier defines "election" as signifying the choice which several persons collectively make of a person to fill an office or place. This is the most usual

acceptation of the term.. We think, also, that he expresses the common opinion of the public in the fourth paragraph under this title, where he says:

"One of the cardinal principles on the subject of elections is that the person who receives a majority or plurality of the votes is the person elected. Generally, a plurality of the votes of the electors present is sufficient, but 'in some states a majority of all the votes is required. Each elector has one vote."

Giving to the language of the Constitution its ordinary signification, it declares the principle that each elector is entitled to express his choice for Representative, as well as all other officers, which is by his vote, and the manner of expressing such choice is by ballot. When he has expressed his preference in this manner, he has exhausted his privilege; and it is not in the power of the Legislature to give to his preference or choice, without conflicting with these provisions of the Constitution, more than a single expression of opinion or choice. As to members of the Legislature, county or township officers, the Constitution nowhere in express terms prohibits the Legislature from enacting a law that the certificates of election shall be issued to the person having the least number of votes. This is practically what is asked for in this case, for relator admits that he has received a minority of the votes cast, if each elector can cast but one vote for a candidate. No one would contend that a law declaring the person who received the least number of votes elected to an office would be a constitutional and valid law; and yet we cannot lay our finger upon the clause prohibiting in terms such legislation.

It is true, the Constitution does not prohibit the Legislature by express language from concocting some scheme by which the equality of the electors in the choice of Representatives may be impaired or defeated. There is

84 MICH—16.

nothing in the Constitution which by express language prohibits the Legislature from enacting a law providing that such electors as appear by the assessment roll of the preceding year to have been assessed $1,000 and upward shall have an additional vote for each $1,000 for which they are assessed and pay taxes on. This would permit every elector qualified under the Constitution to vote at least once, and others to vote as many times as they were assessed $1,000 upon the assessment roll. It requires no argument to show that such legislation would defeat the object of the elective franchise, which is that every elector's franchise is of equal value to that of every other elector, and it would subvert the will of the people as expressed through the ballot. And such is the case before us. No reason can be given why, under our Constitution, one elector should be entitled to vote twice or seven times for any particular person to represent him in the Legislature, when any other elector, who desires to exercise the right which the Constitution gives him to vote for every person allowed by law to represent him in the Legislature, is permitted to vote but once. The choice of the elector, as expressed by the ballot, who "plumps" his vote under this law is equal to the choice of two electors in Grand Rapids, or to seven in Detroit, who exercise the right which the Constitution gives them to vote for every candidate to be chosen. It is no answer to say that he, too, may forego the right of an elector to vote for the number of Representatives which the law permits in cities entitled to more than one Representative; for to do so he is compelled to relinquish a constitutional right, and his right as an elector is in this respect abridged. What different in principle or in result is this law, which permits one elector to cast more than one vote for a candidate, from the act of the person who

stuffs a ballot-box with more votes for a particular candidate than there were electors voting for him? The only difference is that in one case the will of the majority is overcome and defeated under the forms of law, and in the other without law. Both are frauds upon the rights of the majority of the electors; both alike strike down the constitutional safeguards of the people; both are subversive of a free representative government.

It must be conceded that the Constitution, by implication, prohibits cumulative voting in single districts; that is, where but one Representative can be elected. The prohibition is equally strong in cities or towns where, by the Constitution, more than one Representative can be elected. With regard to such municipalities, the Constitution declares that such town or city shall elect by general ticket the number of Representatives to which it is entitled. Here the method of election is prescribed, and cannot be ignored. What is meant by the term "general ticket?" In the connection in which the language occurs, the term "general ticket" is opposed to "partial" or "special," and signifies that the whole number of Representatives to which the town or city is entitled shall be placed upon the ticket to be voted, thereby constituting a "general ticket." This signification corresponds with the primary meaning of the word "general" as defined by lexicographers. It is, moreover, consistent with the provision for electing Representatives when only one is to be chosen, making the whole proceedings uniform throughout the State. Any other construction, or any construction of the Constitution which will permit an elector to vote more than once for the same person to be a Representative, would destroy that uniformity of the right of every elector, wherever he may reside in this State, to cast one vote, and but one vote, for each Representative for which he is entitled to vote; and as was said by Mr.

Justice CAMPBELL in the case of *Attorney General v. Detroit Common Council*, 58 Mich. 216,—

"It cannot be lawful to create substantial or serious differences in the fundamental rights of citizens in different localities in the exercise of their voting franchises."

The law under consideration does create substantial and serious differences between the rights of the electors in Grand Rapids and in Detroit and those of other parts of the State, in the exercise of their voting franchise. In Grand Rapids it defeats the will of a majority of the electors, and, instead of securing a minority representation, it gives an equal representation with the majority. In Detroit, as stated upon the argument of the learned counsel, instead of that municipality being represented in the Legislature by those electors who constituted a majority who voted for Representatives, and, if no elector had voted more than once for any candidate, such majority would have elected seven Representatives, the minority of the electors voting have elected four out of the seven by "plumping" their votes in different parts of the city. Here the will of the majority has been defeated and overridden by votes which do not represent the will of an individual elector in each case, but which do represent, if the law is constitutional, a legal stuffing of the ballot-boxes with false votes. In this State, no matter by what means accomplished, whether because a candidate who receives a majority of the votes is ineligible, or whether an elector votes more than once for a candidate, no person is elected who receives only the vote of a minority of the electors voting. *People v. Molitor*, 23 Mich. 341. Although the Constitution requires Representatives to be elected upon a general ticket in the cases specified, yet every elector is not obliged to vote for every office to be filled, or for every person on the ticket. He may vote for one or more, but

he cannot vote more than once for any one person, for the reason before stated.

Under ordinary circumstances, where a person claims an election to a legislative body which is the sole judge of the election and qualifications of its own members, we should not grant a writ of *mandamus* to compel the canvassing board to reverse its action. *Sherburne v. Horn,* 45 Mich. 160. And while we adhere to the doctrine laid down in several of our previous decisions, that the duties of a canvassing board are purely ministerial, yet, feeling, as we do, that the law is unconstitutional under which the relator claims to have been elected, we should stultify ourselves to command even a ministerial board to observe it. Happily, we are relieved from such dilemma by the honorable course of the relator, who has set up the fact in his petition that he is not entitled to the certificate unless the votes can be counted for him cumulatively, and that a less number of electors voted for him than for those whom the canvassing board have declared elected, and his counsel frankly states to us that unless the cumulative voting law is valid his client has no claim and asks no relief. We have also a precedent from Ohio, where the duty of the canvassing board is ministerial, but who refused a certificate of election to an office claimed to be vacant, but which they deemed not vacant. The supreme court held that although the duties of the canvassing board were ministerial, and they had no right to consider the question of vacancy, yet the court would consider it, and not compel the performance of an act that was useless. *State v. McGregor,* 44 Ohio St. 628 (10 N. E. Rep. 66).

If the people of this State desire to provide for some different means to secure minority representation than that which is in a measure secured by the single district system under the present Constitution, they must do so

through an amendment to that instrument, by which a proposition so vitally interesting to them may be passed upon by the popular vote; but it is to be hoped that, when a plan is submitted to them, it will not be the system of cumulative voting, which obtains such unequal and unjust results, overturning, in many instances, the will of the majority, and concerning which Mr. Horton, in the Penn. Monthly for June, 1873, said:

"The larger the district, the more dangerous the peculiarities of this system. Were it tried on such a scale as that of congressional elections in Ohio, anything like fairness or proportionality would at first be impossible. Tending, as it plainly must, if unrestrained, to make representation fluctuating and disproportionate. It would eventually compel the tightening of the already oppressive bands of party discipline. In general, the scale which, under the present district system, tends now to a majority, and now to a minority, would be permanently weighed down in favor of a minority."

If proportional representation is desired, the Geneva or Gilpin plan approaches the nearest to exact justice. But every plan yet devised is open to serious objection. Were the law under consideration a valid emanation of legislative power, we should not offer any suggestions as to its wisdom or expediency, and what we have said is in response to the argument advanced that there was a wide_ spread and prevailing desire for some sort of minority representation.

Upon consideration of the whole record, the application must be denied.

MORSE and LONG, JJ., concurred with CHAMPLIN, C. J.

GRANT, J. The respondent declined to canvass and count the votes for Representatives in the Legislature in the city of Grand Rapids, and to issue a certificate to relator, according to Act No. 254, Laws of 1889, which provides for cumulative voting in certain cities entitled

to more than one Representative. This refusal is based
upon the unconstitutionality of the act. The relator
thereupon presented his petition to this Court to compel
the canvassing of the votes, and the issuance of a cer-
tificate to him.

At the threshold of this controversy is an insurmount-
able objection to the position taken by the respondent,
if it were insisted upon. The sole duty of the canvassers
under the law is to examine the original statements certified
to them by the several boards of inspectors of election, or
certified or corrected copies thereof, and from them to
ascertain the number of votes cast for the different
officers, and to make statements thereof, and issue cer-
tificates accordingly. They have no discretion, no judicial
power or functions, and no ministerial functions, except
in so far as the word "ministerial" means "clerical,"
which is one of its definitions given by Webster. Their
functions, therefore, are purely clerical. The relator,
upon the face of the returns, was entitled to a certificate
of election. The real question here is, who was elected
Representative? The proceeding by *mandamus* is not the
proper remedy to try the title to an office. This can
only be done, finally and conclusively, by *quo warranto*
proceedings. *Frey v. Michie,* 68 Mich. 323. In my judg-
ment, it was never contemplated by the Legislature that
the board of canvassers should possess any other power
than to canvass the returns and to declare the result.
This does not determine the title to the office. The
certificate is only *prima facie* evidence of title, throwing
the burden of proof upon him who contests. *People v.
Van Cleve,* 1 Mich. 363; *Sherburne v. Horne,* 45 Id. 160.
The canvassers have no right to shift this burden of
proof by withholding the certificate, or issuing it to
another.

But it is said that constitutional questions have often

been raised and decided by this Court in *mandamus* proceedings. This is true where personal and property rights are involved, and great inconvenience and damage would result if prompt action were not taken. In such case the public officer or body charged with the performance of duty may either decline to act on the ground of the alleged unconstitutionality of the law, or he may proceed. In either event *mandamus* will lie,—to set him in motion in the one case, and to restrain him in the other. But this does not apply to cases where the duty of the officer is only clerical or ministerial, and the law provides an ample remedy afterwards to test the validity of his action, and that, too, without any inconvenience or damage. In such case the officer must perform his duty, and leave the parties interested to contest the result in the proper forum and by the proper proceeding. He should not, in such case, be heard to plead the unconstitutionality of the law as an excuse for his refusal.

The result of the respondent's action in this case is to shift the burden of proof to one upon whom the law in such cases does not place it. It can make no difference that that burden involves the constitutionality of the law, rather than a question of fact. This is not the proper proceeding, therefore, to raise the constitutionality of this act of the Legislature; and this Court should, in my judgment, decline to determine it in all cases where it is not expressly waived by the relator. This the relator has done, and upon that ground alone I consent to a determination of the main question. Upon this question I fully concur in the result reached by my Brother CHAMPLIN, and in his reasons therefor.

CAHILL, J., (*dissenting*). I am unable to agree with my brethren in the conclusion that Act No. 254, Laws of 1889, commonly called the "Cumulative Voting Law,"

is unconstitutional. The law requires me to give the reasons for my dissent. In doing so, as the case is one that in a special sense concerns the whole people, I shall be justified in stating some ·of the elementary principles that underlie the question to be decided.

And, first, I may state what *is not* to be decided. This Court has no right to criticise or discuss the wisdom, the policy, the fairness, or abstract justice of an act of the Legislature. The Supreme Court is not the guardian of the Legislature, to see that it does no wrong. The Legislature, when acting within the scope of its constitutional powers, is under no guardianship, and is answerable to no one but the people. The only duty that devolves upon this Court in connection with legislation is to see that the Legislature does not violate the Constitution. Speaking generally, the Legislature may do this in one of three ways:

*First.* Its action may be in excess of the legislative power. By this is meant that, as the government is divided into three departments,—executive, legislative, and judicial,—the Legislature may not usurp or trespass upon the powers that belong to the other departments.

*Second.* It may disregard some direction of the Constitution required to be observed in the manner of enacting laws; such for example, as that which forbids any bills to be introduced after the first 50 days of the session, or that which provides that no law shall embrace more than one object, which shall be clearly expressed in its title.

*Third.* The Legislature may attempt to prescribe a rule of action which is forbidden by the Constitution.

That is what it is claimed has been done in the case of the law in question. It is said that the Legislature has attempted to establish a rule for the conduct of elections of Representatives in the legislative districts where more than one is to be elected which the Constitution forbids. To determine whether this is so, we must

examine the Constitution to see whether it contains any
express prohibition of the act passed, or, if not, then
whether it is forbidden by necessary implication. It is
not claimed that there is anything in the Constitution
that expressly prohibits this act of the Legislature. It is
said by my Brother CHAMPLIN that—

"The Constitution is the outgrowth of a desire of the
people for a representative form of government. The
foundation of such a system of government is, and always
has been, unless the people have otherwise signified by their
constitution, that every elector entitled to cast his ballot
stands upon a complete political equality with every other
elector, and that the majority or plurality of votes cast for
any person or measure must prevail. All free representa-
tive governments rest on this, and there is no other way
in which a free government may be carried on and main-
tained. That the majority must rule, lies at the root of
the system of a republican form of government no less
than in a democratic." From this he deduces that "the
Constitution does not contemplate, but by implication
forbids, any elector to cast more than one vote for any
candidate for any office. This prohibition is implied from
the system of representative government provided for in
that instrument. The political history of the State from
1836 to the present time shows that every elector has an
equal voice in the choice of those who shall represent
the people in the Legislature. It is implied in those
provisions of the Constitution which require that Repre-
sentatives in the Legislature shall be chosen by ballot,
and by single districts. By these provisions every elector
expresses his wish by ballot, and a single vote is implied."

It is because the act in question is supposed by my
brethren to be in conflict with these ideas of what is
involved in a republican form of government that they
hold it invalid.

It was undoubtedly contemplated by the framers of our
Constitution that the State should have and maintain a
republican form of government, with all that is implied;
but it does not follow from this that it was intended
that the judiciary should assume to decide what laws

were best calculated to accomplish that end. The absolute rule of the majority, in which the minority shall have no voice, is not believed by all to be essential to republican government. There are those who contend that a government comes nearest to being a government of the people when it contains representatives of all classes and shades of opinion prevalent in the community represented. It is this idea that is recognized in the division of the State into representative districts. If all the Representatives were elected on one general State ticket, the complexion of the Legislature would tend to be unanimous, one way or the other. By dividing the State into districts, the minority party in the State is able in localities to secure representation. The provision of the Constitution which requires townships or cities entitled to more than one representative to elect them on a general ticket operates, without having been intended so to do, against the wise policy applied by the Constitution to the rest of the State. If the cities of Detroit and Grand Rapids were divided into representative districts, those who belong to the minority party of the city, taken together, might be able to elect one or more Representatives to the Legislature. It will hardly be contended that that would be subversive of a republican form of government. It would, on the other hand, conduce to the advancement of a principle much contended for, that representatives should be brought near to the people. Opinion by MORSE, J., in *Attorney General v. Detroit Common Council,* 58 Mich. 226.

If the position taken by my brethren is correct, that the law is bad because it violates a fundamental principle of republican government, that argument is equally strong against its being adopted into the Constitution by amendment. To so amend the Constitution would, if my brethren are right, be in violation of that provision of

the federal Constitution which requires the United States
to guarantee to every state a republican form of govern-
ment.   Article 4, § 4.   This argument against the law is
based upon the further idea that it gives unequal rights
to electors, and that an elector may be deprived of his
right to vote for all representatives to be elected on the
general ticket; whereas, under it, all electors have an
equality of suffrage, which includes the right to vote for
all or as many of the representatives on the ticket as they
choose.   It is a popular idea that a republican form of
government necessarily involves the right of the majority
to govern; but neither the Constitution of this State, nor
the practice under it, gives any sanction to that idea.
The Constitution says nothing upon the subject, but the
laws which govern elections provide that the person
receiving the highest number of votes shall be elected.
Under this rule it rarely happens that the person elected
is the choice of a majority of the electors, and in some
cases he represents the choice of a comparatively small
minority.   If the right of the majority to govern is
fundamental, it is no answer to this assault upon it to
say that the minority which is permitted to elect is
larger than some other minority that has voted for some
one else.   The fact that any minority is permitted to
rule is conclusive that the rule of the majority is not
essential to popular government.   Neither, in my judg-
ment, is it essential to a government by the people that
elections should be conducted in one way rather than in
another, provided freedom of choice and equality of right
be maintained.   There is nothing essentially destructive
to such a government in a law which permits an elector,
who has the right to vote for several representatives, to
cast the same number of votes for one of such repre-
sentatives, if he prefers to do so.   The essential thing to
him is the right to a voice in the choice of his repre-

sentatives. If he believes he will be better represented by one of the seven than by the other six, certainly no right of his is abridged by allowing him so to express his choice; nor is the right of any other elector abridged, because he may do the same thing if he pleases, or he may scatter his votes among seven.

I have not intended, in what I have said of the merits of this system of voting, to concede that its merits are open to review by this Court. In my view, the merits of the law were conclusively determined by the Legislature when it was enacted, and so remain until it is repealed. I have intended only to show that people differ in their opinions as to whether this law is opposed to the spirit of our institutions as embodied in the Constitution. This brings me to speak of what seems to me the fundamental error upon which the opinion of the majority of the Court rests. It is conceded that the people, by an amendment to the Constitution, could establish this system of voting. This concession rests upon the principle that all political power is inherent in the people. But the people have delegated their power to the different departments of government. "The legislative power is *vested* in a Senate and House of Representatives." Const. Art. 4, § 1. The legislative power so vested is *all* the power before inherent in the people, subject only to such limitations as are expressly or by necessary implication contained in the Constitution. It is said by my Brother CHAMPLIN that the framers of the Constitution had no thought of investing the Legislature with the right to enact this law. The subject-matter of the law is certainly within the domain of legislative power. The Constitution does not provide in detail the manner of holding elections, leaving that to legislative discretion. It could not with propriety have been left to the executive or judicial discretion. The Constitution of 1835 was

like the present, in that it did not provide in detail the manner of holding elections. Under it that power had been assumed by the Legislature from the first. If such a thing were needed, I regard the failure of the framers of our present Constitution expressly to limit a power which the Legislature had assumed to exercise as a concession of such power, with all that is involved in the way of legislative discretion. In *People v. Blodgett*, 13 Mich. on page 136, Mr. Justice CAMPBELL says:

"It was not contended on the argument that, if the Constitution is silent on the subject, the Legislature may not allow the citizens of Michigan to vote beyond its limits. Whether the State can provide such safeguards against abuse abroad as it can at home cannot govern legislative action on such a matter. If there is no constitutional prohibition, the Legislature must determine for itself whether the importance of securing the privilege of voting to its citizens abroad is overbalanced by the difficulty of enforcing all the safeguards against abuse which may be enforced at home in all cases."

In determining whether the Legislature has transcended its powers, we must look to see, not whether such power has been specifically granted, but whether it has been withheld, and, if not withheld, it vested under the original grant of all legislative power inherent in the people. *Scott v. Smart's Ex'rs*, 1 Mich. 307; *People v. Gallagher*, 4 Id. 244; *Sears v. Cottrell*, 5 Id. 257; *Attorney General v. Preston*, 56 Id. 179. If the argument against the law be summed up in a word, it is that it violates what my brethren believe to be the spirit of the Constitution. What is the spirit of the Constitution, apart from its text, which is the body it inhabits? Who shall define it so clearly that there need be no two opinions as to what it is? Is it a guaranty of natural rights, supposed to be inalienable? If so, is there no dispute as to what are natural rights? Is it a guaranty of equal voice in the government? If so, is there no difference of opinion as

to the methods by which such right is best secured? For myself, I am unwilling to search the Constitution for an undefined spirit supposed to pervade it, for the purpose of basing upon such research a right to add anything to, or to take anything from, the Constitution as it reads. If that instrument is not explicit enough; if it covers too many or too few subjects; if it ought to prohibit the passage by the Legislature of a cumulative voting law,—it may be amended. I shall not consent to amend it by construction. It is true that constitutions, like statutes, are to be construed in the light of previous history and the circumstances surrounding their adoption; but this rule of construction, while useful in the interpretation of doubtful clauses or technical words and phrases, will never, in my judgment, justify the interpolation of an idea or principle. When this is permitted, the Constitution in a sense ceases to be a written charter, and exists to a great extent in the judgment and conscience of a changing judiciary. Great danger is to be apprehended if the courts are to say what the spirit of the Constitution is, or what its framers intended more than they said. The instrument is in writing. The people, who made it, can amend it. Where, then, arises the necessity for looking much beyond its plain letter, to discover some occult meaning, discernible only to those who, by reason of their special learning, are able, or believe themselves to be able, to discover the unexpressed intention of the framers of the instrument?

The law of growth applies to governments in all their departments. There is a constant tendency in each to expand its power at the hazard of encroaching upon the rights of other departments. The judicial power is in especial danger from this tendency to arrogate power. The other departments of the government are held in restraint by the judiciary, and by a more intimate

responsibility to the people arising from shorter terms of office. But who shall restrain the courts in the exercise of their judicial functions? The practical difficulties in the way of correcting any misuse of power must ever be a solemn admonition to the judicial conscience to beware of usurpation.

Another cardinal rule that is to be observed in passing upon the constitutionality of statutes is that stated by Mr. Justice CHRISTIANCY in *Sears v. Cottrell*, 5 Mich. 259:

"No rule of construction is better settled in this country, both upon principle and authority, than that the acts of a state legislature *are to be presumed* constitutional until the contrary is shown. * * * In cases of doubt, every possible presumption not clearly inconsistent with the language and the subject-matter is to be made in favor of the constitutionality of the act. The power of declaring laws unconstitutional should be exercised with extreme caution, and never when serious doubt exists as to the conflict." See, also, Cooley, Const. Lim. 182–186.

We were cited on the argument, and allusion is made in my Brother CHAMPLIN'S opinion, to certain extraordinary acts of supposed legislation which it is said are not expressly forbidden by the Constitution, and which it is assumed no one would hesitate to pronounce unconstitutional. As I can conceive of no decision of a court of last resort so tyrannical or unreasonable as not to be conclusive until overruled, so I can conceive of no legislation so unreasonable or unjust as not to be law until repealed, provided it be not forbidden by the Constitution. A conclusive presumption arises to support the action of every department of the government when acting within its jurisdiction. In support of the views here expressed, I cite the following additional authorities: Cooley, Const. Lim. 167–174, and cases cited; 1 Kent. Comm. 448; *Calder v. Bull*, 3 Dall. 398, opinion of Mr. Justice Iredell;

*Cochran v. Van Surlay*, 20 Wend. 383; *People v. Mahaney*, 13 Mich. 481; *Whallon v. Judge*, 51 Id. 503; opinion of Chief Justice COOLEY, concurred in by Mr. Justice CHAMPLIN, in *State Tax Law Cases*, 54 Mich. on pages 395, 446, 447; *Auditor General v. Sloman, ante*, 118.

Treating the question involved as purely one of legislative power, and discovering nothing in the act which was not within the legislative discretion, I hold the law to be constitutional.